*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

CARL JEROME WIERTALLA, JR.,

Defendant-Appellant.

UNPUBLISHED
June 25, 2020

No. 347094
Manistee Circuit Court
LC No. 18-004806-FC

Before: BORRELLO, P.J., and RONAYNE KRAUSE and RIORDAN, JJ.

PER CURIAM.

A jury convicted defendant of three counts[1] of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a); MCL 750.520b(2)(b) (sexual penetration of a victim less than 13 years of age and defendant 17 years of age or greater.) The victim in this case, FS, was the daughter of KC, who was defendant's girlfriend at the time of the abuse. Two of defendant's now-adult children by defendant's former spouse, NG and BG, also testified about defendant sexually abusing them when they were pre-teen children. The trial court sentenced defendant to concurrent prison terms of 35 to 80 years for each conviction. Defendant appeals his convictions and sentences as of right. We affirm.

## I. TESTIMONY AND BACKGROUND

As noted, the victim in this case is FS, the daughter of defendant's former girlfriend, KC. The prosecution presented testimony, pursuant to MCL 768.27a, from two other individuals who defendant also abused when they were pre-teen children.

NG was thirty-three years old at the time of trial. He was the son of defendant's former wife, PG. When NG was in kindergarten, defendant and PG got married and defendant adopted him. NG said that when he was about four years old defendant would have him come into his

---

[1] Count 1 involved penile/oral penetration (fellatio), count 2 involved oral/vaginal penetration (cunnilingus), and count 3 involved digital/vaginal penetration.

bedroom in the morning and rub his feet or massage his legs. The massaging would lead to defendant having NG perform oral sex. According to NG, he was not allowed to go outside and play "until he went to see" defendant. The sexual abuse occurred until NG was five years old, and stopped after NG's sister, BG, was born in December 1990. NG said that he did not tell anyone about the abuse until he told his mother about two years before trial, after learning that defendant had also sexually abused BG as a child.

BG was twenty-seven years old at the time of trial, and was the biological daughter of defendant and PG. BG testified that defendant began sexually abusing her in 1997 when she was seven years old. The abuse started after defendant had "the sex talk that parents have with their kids." During the first incident of abuse, defendant took BG into his bedroom, took her pants off of her, and touched her vagina and performed oral sex on her. BG said that defendant consistently performed oral sex on her and made her perform oral sex on him while her mother was at work. Defendant also touched BG's vagina with his fingers, but BG could not recall whether he penetrated her vagina. BG said that when she was eight and nine years old, she and defendant would lie next to each other in bed and fondle each other. She estimated that the incidents occurred 15 to 20 times when she was between the ages of 7 and 10 years old. The abuse stopped when she was 10 years old, just before her parents divorced.

At some point in 1999 or 2000, defendant and PG divorced, and defendant began dating CJ, with whom BG became and remained close. BG testified that she was, however, angry at defendant, whom she regarded as "a poor father." When she was 12 or 13, she disclosed defendant's abuse to some friends at a sleep-over, one of the friends reported it to their mother, that mother contacted PG, and PG reported it to the police. An investigation by CPS ensued, but defendant prevailed upon BG to recant. The CPS investigation was closed in 2003 as unsubstantiated. BG remained in contact with defendant; partly due to his relationship with CJ and, later, with BG's sister AW, who was defendant's biological child with KC.[2] BG also hoped to be able to forgive defendant eventually. However, BG had no face-to-face contact with defendant after 2010, and she engaged in therapy. She disclosed the abuse to NG and PG in 2016.

KC testified that she met defendant in 2009 or 2010. They began dating, and they began living together in 2010 or 2011, when FS was four or five years old.[3] FS was twelve years old at the time of trial, and she testified that defendant began abusing her when she was four years old. FS testified with apparent difficulty, explaining that defendant touched her "bad spot" with his hands, his mouth, and his own "bad spot." She defined her "bad spot" as "where she goes pee" and as her "area." She defined defendant's "bad spot" as "where he goes pee."[4] FS said that defendant put his "bad spot on mine" and that his bad spot touched her "where she goes pee" and "my mouth too." She said that defendant "put it in her mouth" and made her "suck it" "a lot of

---

[2] Defendant's parental rights to AW were subsequently terminated, largely as a result of defendant's convictions in this matter. See *In re AK Wiertella Minor*, unpublished per curiam opinion of the Court of Appeals, Docket No. 350331 (decided April 16, 2020).

[3] KC explained that she was "not good with math."

[4] In response to questioning by the court, FS further explained, with obvious discomfort, that a girl's bad spot is also called a pussy and that a boy's bad spot is also called a penis.

times." "White stuff" came out of defendant's bad spot and got into her mouth when defendant put his bad spot in her mouth. FS said that defendant would also "lick and stuff" her "pee area" "on the outside" "a lot." Defendant also touched her pee area with his fingers "inside and outside."

FS said that the incidents occurred "more than six times" and that the abuse ended when she was nine years old. FS testified that the incidents made her feel scared and "grossed out." She felt guilty not telling anyone about it, but she was afraid to tell anyone because she feared she would get "in very, very trouble" if she did. Furthermore, defendant told her not to tell anyone because "me and you might end in up jail or something." FS explained that although defendant "wasn't that bad" when he first moved in, she quickly became frightened of him "because he was threatening mom and stuff," he "would like put his hands on us and stuff," and "he was punching holes in our walls."

FS testified that she first told KC about the abuse when she was nine years old. KC talked to defendant about FS's disclosures, but admitted that at the time, she did not want to believe them. She initially accepted defendant's denial and explanation: that his daughter, BG, had made similar allegations in the past that were not substantiated, and he believed that the "kids were just mad at him for not doing enough family stuff." KC ended her relationship with defendant in October 2017. The breakup was apparently unrelated to FS's abuse, although at some point thereafter, FS brought defendant's abuse to KC's attention again. On December 26, 2017, KC's then-friend (and current boyfriend) called 911 because FS "was getting out of hand" and "being out of control." The police responded to KC's home for the "incorrigibility" call and were able to calm FS down. Afterwards, KC spoke to the police about FS's allegations.[5]

Detective Sergeant John Glass conducted a forensic interview with defendant and asked defendant to "tell his side of the story." Defendant said that on one occasion when FS was about seven years old he had just got out of the shower and walked naked to his bedroom and sat on his bed to look at his phone. FS came into the bedroom, sat next to him, and put her head on his shoulder to look at his phone. FS then went down and put her mouth on his penis "for about a second" and then defendant told her "no" and to "stop it, it isn't right." Glass asked defendant why FS would simulate fellatio, and defendant said that an incident occurred when he was in the shower with FS and "she tried to go down on me." Defendant was initially quiet during the interview, but when confronted with allegations of prior sexual abuse involving his stepson, NG, and his daughter, BG, defendant became angry and blamed KC. He also blamed PG, the mother of NG and BG. Defendant said that there was "a very large conspiracy with these women and their child, collusion."

---

[5] The reason for FS being "out of control" was not explained to the jury. However, according to the presentence investigation report (PSIR), KC explained that FS's outburst was precipitated by KC holding a "family meeting," during which "FS became angry and yelled at her, alleging that she told [KC] about what the defendant did to her and [KC] did nothing."

## II. OTHER-ACTS EVIDENCE

Defendant argues that the trial court abused its discretion by admitting other-acts testimony under MCL 768.27a because the testimony was more prejudicial than probative under MRE 403 and that he was prejudiced by admission of the evidence. We disagree.

The trial court's decision whether to admit evidence is reviewed for an abuse of discretion, but preliminary legal determinations of admissibility are reviewed de novo; it is necessarily an abuse of discretion to admit legally inadmissible evidence. *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010); *Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016). There is no dispute that the evidence was, at least ostensibly, legally admissible pursuant to MCL 768.27a, which provides an exception to the general prohibition under MRE 404(b) against evidence of other acts for the purpose of showing propensity. *People v Watkins*, 491 Mich 450, 476-477; 818 NW2d 296 (2012). However, such evidence may be inadmissible pursuant to MRE 403 if, in relevant part, "the danger of unfair prejudice substantially outweighs the probative value of the evidence." *Id.* at 481, quoting MRE 403. "All relevant evidence is prejudicial," so MRE 403 only applies to *unfair* prejudice, where "there is a tendency that evidence with little probative value will be given too much weight by the jury." *People v McGhee*, 268 Mich App 600, 613-614; 709 NW2d 595 (2005). "The trial court is in the best position to make MRE 403 determinations on the basis of a contemporaneous assessment of the presentation, credibility, and effect of testimony[.]" *People v Mardlin*, 487 Mich 609, 627; 790 NW2d 607 (2010) (quotation omitted).

When making an admissibility determination under MRE 403, the trial court may consider the following non-exhaustive list of factors:

> (1) the dissimilarity between the other acts and the charged crime, (2) the temporal proximity of the other acts to the charged crime, (3) the infrequency of the other acts, (4) the presence of intervening acts, (5) the lack of reliability of the evidence supporting the occurrence of the other acts, and (6) the lack of need for evidence beyond the complainant's and the defendant's testimony. [*Watkins*, 491 Mich at 487-488.]

Importantly, when weighing evidence admitted under MCL 768.27a, evidence may not be considered unfairly prejudicial "merely because it allows a jury to draw a propensity inference." *Id.* at 487. Rather, courts should consider the extent to which the other-acts evidence supports the victim's credibility and rebuts any defense attack on the victim's credibility. *Id.* at 491-492.

With respect to the first factor—dissimilarity between the other acts and the charged crimes—both BG and NG testified that they were sexually abused when they were under the age of 10 and that they were forced to perform fellatio on a regular basis while defendant was living in the home. BG testified that defendant digitally fondled her vagina. The trial court found that the only dissimilarity between the other acts and the charged crimes in this case was that NG was a male child victim. We find no reason to deem the victim's gender relevant under the circumstances, especially given the similarities between the victims' ages and the manners in which defendant conducted the abuse.

With respect to the second factor—temporal proximity of the other acts to the charged offenses—the trial court recognized that the other acts against NG occurred more than 25 years before the charged offenses and that the other acts against BG occurred more than 10 years before the charged offenses. Remoteness in time affects the weight of the evidence, but does not affect its inadmissibility. *McGhee*, 268 Mich App at 611-612. By itself, remoteness in time is "insufficient to dispel the probative value" of highly-similar prior conduct. *Id*. at 611. Furthermore, the timeline actually spans approximately 28 years from when defendant *began* abusing NG until he *stopped* abusing FS; and in the case of each victim, the abuse took place over several years. See *People v Starr*, 457 Mich 490, 492-493; 577 NW2d 673 (1998). Notably, in each case, the victim was a similar age when defendant began abusing them, and they were in similar relationships. The temporal gaps are overwhelmingly likely to reflect opportunity rather than reform. See *People v Solloway*, 316 Mich App 174, 195; 891 NW2d 255 (2016) (a 12-year separation between the prior act and the charged offense did not preclude the admission of the prior act given how similar the acts were).

Regarding the third factor—infrequency of other acts—the trial court noted that both other-acts witnesses described the repetitive nature of the sexual abuse. Regarding the fourth factor—the presence of intervening acts—the trial court acknowledged that NG and BG's mother and defendant divorced, and there was some evidence to suggest that NG and BG were angry at defendant for being a bad father. The trial court said that it would consider the intervening act of divorce to the extent that it could have caused the other-acts witnesses to harbor bias, anger, and disappointment. Nevertheless, NG and BG did not come forward until more than a decade after the divorce. Regarding the fifth factor—the lack of reliability of the evidence supporting the occurrence of the other acts—the trial court considered the credibility of both witnesses and concluded that their testimony was sufficiently reliable to put before a jury. The trial court is in the best position to determine the credibility of witnesses. *Marlin*, 487 Mich at 627. With respect to the sixth factor—whether the other acts are unnecessary to prove the state's case—the other-acts evidence played a crucial role in the prosecution's case because this matter was ultimately a credibility contest.

We therefore conclude that the factors to be considered under MRE 403 generally weigh in favor of admission, so the trial court did not abuse its discretion by admitting the other-acts testimony under MCL 768.27a.

### III. SIXTH AMENDMENT RIGHT TO COUNSEL

Defendant argues that the trial court denied him his Sixth Amendment right to counsel of his choice by refusing to appoint an attorney after defendant advised the court that he fired his retained counsel. Defendant contends that he was "forced" to proceed to trial with his retained counsel. We disagree.

We review constitutional questions de novo. *People v Powell*, 303 Mich App 271, 274; 842 NW2d 538 (2013). However, we review a trial court's decision affecting a defendant's right to counsel of his or her choice for an abuse of discretion. *People v Akins*, 259 Mich App 545, 556; 675 NW2d 863 (2003).

-5-

The record reflects that defendant expressed frustration with his retained trial counsel. Shortly after counsel filed a motion for a mental competency examination for defendant, against defendant's wishes, defendant wrote a letter to the court stating that he had terminated his retained counsel and wanted the court to appoint the attorney who was representing him in other child custody proceedings. The trial court deferred ruling on defendant's request until defendant was deemed competent. However, the trial court nevertheless placed defendant under oath, whereupon defendant explained that he did not believe counsel was asking questions defendant wanted him to ask, gathering evidence, or contacting witnesses. The trial court opined that although defendant's counsel was retained, the good cause standards for replacing appointed counsel applied, and defendant's general dissatisfaction had not established good cause. The trial court nevertheless assured defendant that he "can always hire your own attorney," although defendant should do so expeditiously given the trial schedule. Defendant stated, "[w]ell, then that's the step I'll take next."

At the next hearing, after defendant had been deemed competent, the trial court again placed defendant under oath and asked how defendant wished to proceed. The trial court again explained that if defendant could not afford an attorney, it would appoint one for him. However, defendant would have no control over who would be appointed. The trial court reminded defendant that he had indicated he would hire an alternative attorney and asked whether defendant was satisfied with his current attorney's representation. Defendant stated that he was satisfied, and that he "withdr[e]w" his termination. By the time of trial, defendant had, in fact, hired the other attorney as co-counsel, and both attorneys represented him at trial.

Defendant was not deprived of any right to counsel. Defendant contends that the trial court lacked the authority to respond to defendant's letter in any way other than appointing substitute counsel. However, a defendant's right to counsel of choice may be subject to considerations such as delay or the legitimacy of defendant's dispute with the attorney. *Akins*, 259 Mich App at 557. We find nothing improper about deferring ruling on defendant's request to terminate his counsel until after concluding the inquiry into defendant's competence. See *Godinez v Moran*, 509 US 389, 396; 113 S Ct 2680; 125 L Ed 2d 321 (1993) (waiver of a right to counsel must be knowing, competent, and intelligent). We also find nothing improper about the trial court's concern with keeping the trial on schedule. The trial court correctly explained to defendant that he had a right to retain any counsel of his choosing, but he did not have a right to have any particular counsel appointed. See *People v Portillo*, 241 Mich App 540, 542-543; 616 NW2d 707 (2000). Even if the trial court had erred, which it did not, defendant thereafter withdrew the "termination," thus extinguishing any such error. See *People v Carter*, 462 Mich 206, 215-216; 612 NW2d 144 (2000). Finally, defendant did successfully retain his specifically desired attorney, so it is difficult to understand how he can claim any prejudice.

## IV. EXPERT TESTIMONY REGARDING OTHER-ACTS TESTIMONY

Defendant argues that the trial court erred by permitting an expert in the dynamics of child sexual abuse, Thomas Cottrell, to testify at trial and at an evidentiary hearing held to determine whether to admit the testimony from NG and BG at trial. We disagree.

To the extent defendant argues that Cottrell should not have testified at the evidentiary hearing, any such argument is moot. We have already held that the testimony from NG and BG

was properly admitted at trial. The expert testimony at the evidentiary hearing was for the benefit of the trial court determining admissibility of NG's and BG's testimony, not for the benefit of the trier of fact. Even if we were to accept defendant's assertion of error at face value, because the other-acts testimony from NG and BG was properly admitted, any such error cannot have affected the outcome of the proceedings. Any such error would therefore not be grounds for reversal. *People v Krueger*, 466 Mich 50, 54; 643 NW2d 223 (2002); see also *People v Hall*, 435 Mich 599, 610-612; 460 NW2d 520 (1990). We therefore consider only whether Cottrell's expert testimony was properly admitted at trial.

Defendant does not provide any substantive argument regarding Cottrell's testimony at trial. Thus, this issue is abandoned. *Mitcham v City of Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). However, because defendant does provide substantive argument regarding Cottrell's testimony at the hearing, we choose to exercise our discretion to construe that argument as applicable to the expert testimony at trial. See *Mack v Detroit*, 467 Mich 186, 207; 649 NW2d 47 (2002); *Paschke v Retool Industries (On Reh)*, 198 Mich App 702, 705; 499 NW2d 453 (1993), rev'd on other grounds 445 Mich 502; 519 NW2d 441 (1994). Defendant argues generally that Cottrell's testimony was overbroad and thus only marginally relevant, but that it would improperly buttress the credibility of NG and BG. We disagree.

Initially, we observe that *defendant* asked Cottrell whether he had an opinion about whether FS was telling the truth, although the trial court properly sustained the prosecution's timely objection. See *People v Peterson*, 450 Mich 349, 369; 537 NW2d 857 (1995). Also on cross-examination, defendant elicited testimony from Cottrell that although false allegations did occur, they were rare. Ordinarily, that kind of probability estimate from an expert could constitute improper vouching for a child sexual abuse complainant, despite the expert knowing nothing about the specific case. *People v Thorpe*, 504 Mich 230, 259-260; 934 NW2d 693 (2019). However, "[e]rror to be reversible must be error of the trial judge; not error to which the aggrieved appellant has contributed by planned or neglectful omission of action on his part." *Smith v Musgrove*, 372 Mich 329, 337; 125 NW2d 869 (1964). Defendant did not merely fail to object to potentially improper testimony,[6] defendant affirmatively—and clearly knowingly—procured it. Consequently, to the extent, if any, that Cottrell impermissibly vouched for FS, Cottrell did so specifically and directly at defendant's request, so any such vouching may not be grounds for appellate relief.

Otherwise, Cottrell's testimony at trial can best be described as generally explaining that different people will react in widely differing ways to the same, or to different, kinds of sexual or other abuse. Cottrell had no knowledge of the specifics of this case, and he had never met FS, NG, or BG. He explained that he was a clinician, and "as clinicians we are not in the business of fact finding." He explained that victims might delay in disclosing abuse for any number of reasons, perhaps a quarter of them recanted for an equally wide range of reasons, and it was not uncommon for victims to nevertheless want some kind of relationship with their abuser afterwards. Cottrell opined that "it's a common misconception that being sexually abused is an all-or-nothing proposition with regard to what children feel towards their assailant."

---

[6] We need not, and we do not, decide whether this testimony actually was improper.

None of the three testifying victims of defendant's sexual abuse, FS, NG, and BG, disclosed the abuse immediately. All three maintained some kind of relationship with defendant during and after the abuse, although in the case of FS, she had no choice in the matter. Consequently, Cottrell's testimony was entirely relevant and helpful, because without it, the jurors might reasonably have doubted the victims' credibilities. As defendant even admits, "[a]n expert may testify regarding typical symptoms of child sexual abuse for the sole purpose of explaining a victim's specific behavior that might be incorrectly construed by the jury as inconsistent with that of an abuse victim or to rebut an attack on the victim's credibility." *Peterson*, 450 Mich at 737 (emphasis omitted). Aside from defendant's own questioning, Cottrell's testimony fell entirely within the parameters of *Peterson*. Bolstering the victims' testimonies preemptively against a likely attack or a likely misapprehension is, in fact, the point. The only potentially improper testimony provided by Cottrell was, as noted, directly elicited by defendant.

## V. JUDICIAL BIAS

Defendant argues that he was denied a fair trial by judicial bias. A party must raise a claim of judicial bias before the trial court to preserve the issue for appellate review. *People v Jackson*, 292 Mich App 583, 597; 808 NW2d 541 (2011). Defendant did not raise the issue of judicial bias below. "Therefore, we review this issue for plain error affecting defendant's substantial rights." *Id*. We find no indication of bias on this record.

A defendant has a right to a neutral and detached judge. *People v McDonald*, 303 Mich App 424, 437; 844 NW2d 168 (2013). The judge is presumed to be impartial, and a party must demonstrate that the judge was not impartial. *Cain v Dep't of Corrections*, 451 Mich 470, 496-497; 548 NW2d 210 (1996). "A trial judge's conduct deprives a party of a fair trial if a trial judge's conduct pierces the veil of judicial impartiality." *People v Stevens*, 498 Mich 162, 170; 869 NW2d 233 (2015). "A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Id*. at 171.

Defendant first argues that the trial court exhibited bias when it sua sponte dismissed a juror for cause. During voir dire, the juror indicated that she did not believe a defendant could be convicted of sexual assault without DNA evidence, because it "would only be his word against her word," which the juror regarded as "no proof." This is, in fact, blatantly contrary to the law, especially in sexual assault cases. MCL 750.520h; *People v Gursky*, 486 Mich 596, 623; 786 NW2d 579 (2010); *People v Lemmon*, 456 Mich 625, 643 n 22; 576 NW2d 129 (1998). Thus, the juror would clearly have difficulty following the instructions she would inevitably be given and "show[ed] a state of mind that w[ould] prevent [her] from rendering a just verdict." MCR 2.511(D)(3). The trial court was not biased, but rather it was obligated to excuse the juror for cause. MCR 6.412(D)(2).

Defendant also argues that the trial court showed bias in two exchanges that occurred during defense counsel's cross-examination of FS. In relevant part, FS and KC testified that defendant had on one occasion helped FS apply medication to her vagina, with KC present, and that there had been nothing improper about doing so. They also testified that at some point FS had showered with defendant, again while KC was present, and nothing improper had occurred. The

trial court interrupted defendant's cross examination of FS to ask FS how old she had been when the showering occurred. Defendant contends that the trial court's interruption of his cross-examination of FS to ask KC how old she had been demonstrated bias. Trial courts are permitted to ask relevant questions of witnesses for purposes of clarification. *McDonald*, 303 Mich App at 437. We cannot comprehend how the trial court's inquiry was anything other than a reasonable, relevant, and appropriate request for clarification.

Defendant also cross-examined KC, over the prosecution's objection, regarding angry electronic messages she had sent to defendant. Defendant explained that the purpose for the questioning was to show bias. Defendant elicited testimony that KC sent the messages shortly before she spoke to the police about FS's abuse; and in the message, she stated that she hoped defendant would "lay a hand on" her so she could "turn [his] life upside down and make it a living nightmare." Shortly thereafter, defense counsel asked KC if she needed a break, presumably due to her anxiety. During that break, outside the presence of the jury, the trial court warned defendant that it would permit the prosecutor "to explore why [KC] was so angry with [defendant]." On redirect, the prosecutor referred to the message and simply asked, "[w]hat were you angry about, [KC]?" KC responded, "[j]ust us having our fallouts, just really having a spat, an argument, just a regular mad – I was angry, so I said things I shouldn't have." The prosecutor did not follow up on that response.

Defendant contends that the trial court's warning constituted "coaching of the prosecutor on how to cure the damage done by" the message. We disagree. We note that throughout the proceedings, the trial court displayed a commendable commitment to fairness for both parties, even though both of them seemingly made the court's job harder at times. It appears that the trial court was simply giving defendant fair advance notice that it would permit the prosecutor to do the obvious. In any event, given KC's vague response, we find no prejudice. We have reviewed the rest of the proceedings and find nothing in the record to suggest that the trial court was anything but scrupulously fair and impartial.

## VI. RIGHT TO CONFRONT WITNESSES

Defendant argues that the trial court refused to permit him to inquire into statements made by FS during a forensic interview regarding an unrelated CSC investigation of a different person, TW, but also involving FS. The forensic interview took place in August 2017, and defendant contends that during the interview, FS denied having been touched by anyone else other than TW. The trial court ruled that the scope of defendant's inquiry into the August 2017 forensic interview would be limited, but it *did* in fact permit defendant to ask his requested question. Unfortunately for defendant, FS initially did not recall the interview at all. Defendant refreshed FS's memory that the interview occurred by showing FS her prior testimony from the preliminary examination. FS then testified, in response to somewhat confusing questioning, that she *did* tell the forensic interviewer that defendant had touched her bad spot. Defendant then moved on to other questioning.

Defendant makes a confusing argument to the general effect that he should therefore have been permitted to fully explore the TW case, but fails to provide any reasonable explanation[7] of how the TW case itself would be at all relevant, let alone not be precluded by the rape-shield law, MCL 750.520j.  See *People v Adair*, 452 Mich 473, 478-482; 550 NW2d 505 (1996).  We note that at the preliminary examination, FS was not asked what she did or did not disclose during the August 2017 interview.  Furthermore, at the beginning of trial, defendant explicitly conceded that the rape-shield law would preclude any further inquiry into the context of the August 2017 interview.  Defendant indicated at a hearing on the motion in limine regarding the August 2017 interview that he had a transcript of the interview.  However, defendant did not seek to use any portion of that transcript to refresh FS's memory, nor did defendant seek to call the interviewer as a witness.  We find that defendant was not denied his constitutional right to confront witnesses; rather, he was denied an opportunity to make an impermissible inquiry and made a tactical error.

Defendant argues that because he was not permitted to discuss the TW case with FS, he "tried vainly to get the damaging witness statement in through the child's mother, [KC]."  The trial court did not permit defendant to ask KC about the August 2017 forensic interview.  Initially, we have not found anything in the record clearly stating that KC personally witnessed the interview; only that she and a friend took FS to the interview.  Generally, parents are not present during forensic interviews with children.  See 722.628(6); *State of Michigan Governor's Task Force on Child Abuse and Neglect and Department of Health and Human Services Forensic Interviewing Protocol, 4th ed*, pp 2-3, 4.[8]  Even presuming no foundational impediment,[9] much of the interview would have been inadmissible pursuant to the rape-shield law, as noted.  Furthermore, it is not clear that defendant's proposed testimony, even limited to narrowly questioning whether FS denied having been inappropriately touched by defendant, would be admissible in any event.

Defendant explained to the trial court at the beginning of trial that he wanted the testimony from FS to show that FS had an opportunity to disclose defendant's abuse, but FS failed to do so.  Thus, defendant sought the testimony to directly prove the central issue in the case.  Testimony from KC that FS had denied being inappropriately touched by defendant would be hearsay if introduced to show that FS had not, in fact, been inappropriately touched by defendant.  See *People v Johnson*, 315 Mich App 163, 193; 889 NW2d 513 (2016); see MRE 801(c).  We recognize that hearsay can be admissible for the purpose of impeachment, subject to some limitations.  See *People v Shaw*, 315 Mich App 668, 683-685; 892 NW2d 15 (2016).  In response to the prosecutor's objection based on hearsay and relevance, defendant merely explained, "[w]e're not asking what was said; just the opportunity – the absence of a statement and the opportunity to make such a statement to [the interviewer]."  Defendant did not mention impeachment.  Furthermore, at the motion in limine, defendant explained that FS made an express denial during the interview, not

---

[7] Defendant argues that "No one believed her unchaste and all recognized her status as a victim in the [TW] case," so such an inquiry would not have been "a matter of putting the complainant on trial for her character."  This misses the point by a remarkable margin.

[8] Available at < https://www.michigan.gov/documents/dhs/DHS-PUB-0779_211637_7.pdf >

[9] We recognize that KC might have observed the interview from outside the room, so establishing foundation might be possible, but defendant has not pointed to anything in the record doing so.

-10-

that she merely failed to mention defendant. Thus, defendant was clearly still seeking to elicit hearsay to prove the central issue in the case, not for impeachment. The trial court did not abuse its discretion when it precluded defense counsel from eliciting hearsay testimony. Again, defendant's right of confrontation was not violated.

## VII. DIRECTED VERDICT

Defendant argues that the trial court erred by denying his motion for a directed verdict of acquittal on count 2, because the prosecution failed to present sufficient evidence of the element of penetration. Defendant did not specifically make that argument to the trial court; rather, defendant argued that the evidence showed defendant's contact with FS to have been only for medical purposes and for hygiene in the shower. Nevertheless, we choose to construe defendant's argument on appeal as a more well-developed argument rather than a novel argument. See *Steward v Panek*, 251 Mich App 546, 554; 652 NW2d 232 (2002). Thus, we review the trial court's decision de novo to determine whether the evidence presented up to the time the motion was made, viewed in the light most favorable to the prosecutor, could persuade a rational trier of fact that the essential elements of the crime charged were proved beyond a reasonable doubt. *People v Chelmicki*, 305 Mich App 58, 64; 850 NW2d 612 (2014).

Defendant's argument is nevertheless misplaced. FS testified that defendant touched her with his mouth, explaining that "he'll lick and stuff," and with his finger. She explained that he touched her "pee area" both "inside and outside," and licked her "pee area" outside. The trial court correctly observed that sexual penetration includes cunnilingus. MCL 750.520a(o). Cunnilingus is by definition an act of sexual penetration, and it consists of " 'placing the mouth of a person upon the external genital organs of the female which lie between the labia, or the labia itself, or the mons pubes.' " *People v Legg*, 197 Mich App 131, 132-134; 494 NW2d 797 (1992), quoting *People v Harris*, 158 Mich App 463, 470; 404 NW2d 779 (1987). "[T]here is no requirement, if cunnilingus is performed, that there be something additional in the way of penetration for the sexual act to have been performed." *Harris*, 158 Mich App at 470. Although FS used the term "pee area," she testified that an alternative word was "pussy;" both are nontechnical terms for the external genital organs of a female human. Licking the genital organs constitutes cunnilingus, which constitutes sexual penetration. The motion for directed verdict was therefore properly denied.

## VIII. JURY INSTRUCTIONS

Defendant argues that the trial court erred by declining his request to instruct the jury on the cognate offense of second-degree criminal sexual conduct (CSC-II) with respect to count 2 because FS's testimony was ambiguous and would have allowed the jury to find that defendant's conduct was insufficient to support the element of penetration. "We review a claim of instructional error involving a question of law de novo, but review the trial court's determination that a jury instruction applies to the facts of the case for an abuse of discretion." *People v Mitchell*, 301 Mich App 282, 286; 835 NW2d 615 (2013) (quotation omitted). Even when instructional error occurs, "[r]eversal is warranted only if after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative." *Id*. (quotation marks and citation omitted).

"[A] requested instruction on a *necessarily included* lesser offense is proper if the charged greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense and a rational view of the evidence would support it." *People v Cornell*, 466 Mich 335, 357; 646 NW2d 127 (2002) (emphasis added). However, CSC-II is a cognate, not a necessarily included, lesser offense of CSC-I. *People v Lemons*, 454 Mich 234, 254; 562 NW2d 447 (1997). A requested instruction on a cognate offense must be "[]consistent with the evidence and defendant's theory of the case." *People v Heflin*, 434 Mich 482, 499; 456 NW2d 10 (1990). FS's testimony, if believed by the jury, unambiguously established that defendant performed cunnilingus on her, which, as discussed, satisfies the element of penetration. Furthermore, defendant's theory of the case, as expressed during both closing and opening argument, was simply that FS, NG, and BG were lying. Thus, an instruction on CSC-II was not consistent with either the evidence or defendant's theory of the case. The trial court therefore properly declined to instruct the jury on the cognate offense of CSC-II.

## IX. SENTENCE

Defendant finally argues that his sentences are unreasonable. Defendant contends that the trial court's reasoning for exceeding the mandatory minimum sentence of 25 years under MCL 750.520b(2)(b) did not justify the extent of the departure and was already taken into account by the offense variables. We disagree.

"The trial court's fact-finding at sentencing is reviewed for clear error." *People v Lampe*, 327 Mich App 104, 125-126; 933 NW2d 314 (2019). "A sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness." *People v Dixon-Bey*, 321 Mich App 490, 520; 909 NW2d 458 (2017) (quotation marks and citation omitted). "[T]he standard of review to be applied by appellate courts reviewing a sentence for reasonableness on appeal is abuse of discretion." *Id*. (quotation marks and citation omitted; alteration in original). Although the sentencing guidelines are no longer mandatory in Michigan, trial courts are still required to "consult the applicable guidelines range and take it into account when imposing a sentence." *People v Lockridge*, 498 Mich 358, 391-392; 870 NW2d 502 (2015).

"A sentence is unreasonable—and therefore an abuse of discretion—if the trial court failed to adhere to the principle of proportionality in imposing its sentence on a defendant." *Lampe*, 327 Mich App at 125. "[T]he principle of proportionality . . . requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *People v Walden*, 319 Mich App 344, 351-352; 901 NW2d 142 (2017) (quotation marks and citation omitted). The trial court must consider "the nature of the offense and the background of the offender," and courts may "depart from the guidelines when, in their judgment, the recommended range under the guidelines is disproportionate, in either direction, to the seriousness of the crime." *Id*. at 352 (quotation marks and citations omitted). When applying the principle of proportionality, factors that may be considered by the trial court include, but are not limited to:

> (1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation. [*Id*. at 352-253 (citation omitted).]

In this case, the sentencing guidelines range was 108 to 180 months, which reflected a prior record variable (PRV) score of zero (PRV level A) and an offense variable (OV) score of 130 (OV level VI). Defendant does not challenge his guidelines scores on appeal.

The trial court considered several factors when fashioning defendant's sentence, including the effects of the abuse on FS as evidenced by her behavior; the likelihood of a lifetime of effects, as evidenced by the effect of defendant's abuse on NG and BG; the length of time that FS endured the abuse; and his incredible attempt to explain away his conduct; and the trial court's observations of how defendant reacted during the police interview that was not played for the jury. The court also considered defendant's lack of criminal history, his favorable employment history, and his honorable discharge from the United States Air Force.

The trial court also reasonably deemed the 10 points scored for offense variable (OV) 4, MCL 777.34, which addresses psychological harm to a victim, inadequate under the circumstances. "Although OV 4 accounts for psychological injuries suffered by victims, it does not . . . always account for the unique psychological injuries suffered by individual victims." *People v Anderson*, 298 Mich App 178, 189; 825 NW2d 678 (2012) (citations omitted). The psychological harm to FS was readily apparent from her behavior, and there was evidence that NG and BG also continued to suffer from the effects of their abuse by defendant into their adulthoods. On this record, the court properly considered this fact when fashioning defendant's sentence.

The trial court also took into account that defendant had repeatedly abused FS over a lengthy period of time. The trial court scored 50 points for OV 13, which addresses a "continuing pattern of criminal behavior." MCL 777.43(1). A score of 50 points for OV 13 is appropriate when "[t]he offense was part of a pattern of felonious criminal activity involving 3 or more sexual penetrations against a person or persons less than 13 years of age." MCL 777.43(1)(a). A preponderance of the evidence supports the conclusion that defendant had sexually abused FS more than just the three times accounted for in OV 13. FS said that defendant sexually assaulted her at least six times, and implicitly even more than that, from the ages of four through nine. Accordingly, it is plain that OV 13 did not adequately account for the duration and extent of the assaultive behavior against FS. The court's consideration of this fact was, therefore, appropriate.

The trial court also considered defendant's denial that the abuse occurred and his attempt to deflect blame onto FS. Again, the trial court relied on having been able to watch the recording of defendant's police interview and defendant's responses to questioning. It correctly recognized that defendant had an absolute right to maintain his innocence, but it opined that, among other things, the account he gave of FS spontaneously performing fellatio on him after accidentally seeing a pornographic video was completely incredible. These considerations are relevant to defendant's potential for rehabilitation. The court's consideration of this factor was appropriate.

In short, in departing upward from the guidelines and imposing a sentence beyond the 25-year mandatory minimum, the trial court properly considered the seriousness of the offenses and surrounding circumstances as well as the circumstances surrounding the offender. A number of the factors identified by the court were not fully accounted for by the sentencing guidelines. On

this record, the trial court did not abuse its discretion in determining that a minimum 35-year prison sentence was reasonable.

Affirmed.

/s/ Stephen L. Borrello
/s/ Amy Ronayne Krause
/s/ Michael J. Riordan